**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGEL MUNIZ,<br><br>                Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                Defendant. | Civil Action No. 13-1026 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge**.**

Before the Court is Angel Muniz ("Plaintiff" or "Claimant")'s appeal, which seeks review of Administrative Law Judge ("ALJ") Richard L. De Steno's denial of Plaintiff's application for a period of disability, disability insurance benefits, and supplemental security income.  The Court declines Plaintiff's request for oral argument, and, thus, resolves this matter on the parties' briefs pursuant to Local Civil Rule 9.1(f).  For the reasons set forth below, the Court **AFFIRMS** the final decision of the Commissioner of Social Security (the "Commissioner").

## I.      BACKGROUND

### A.      Procedural History

On May 14, 2007, Plaintiff, alleging disability as of April 30, 2007, applied to the Social Security Administration (the "Administration") for a period of disability, disability insurance benefits, and supplemental security income.  (R. at 83-84.)[1]  The Administration denied

---

[1] "R." refers to the pages of the Administrative Record.

Plaintiff's application and subsequent request for reconsideration.  (*Id.* at 38-47).  In response, Plaintiff requested an administrative hearing, which occurred before ALJ James Andres on October 6, 2009.  (*Id.* at 23-37, 53-55).

At the hearing, Plaintiff, who was then thirty-one years old,[2] testified that he is a high school graduate, having attended a special education program, and that he can read and write. (*Id.* at 26, 28).  He also testified that he then weighed about three hundred and eighty pounds, had most recently worked part-time as cashier from 2005 to 2007, and had never held a full-time job.  (*Id.* at 27-28).  With regard to his lifestyle, Plaintiff described himself as a "solitary person," noting that at the time he lived alone in his apartment, spent each day watching television in his room, and went outside only to walk to a nearby corner store.  (*Id.* at 31).  Plaintiff further testified that he was unable to work because of his back problems, left knee problem, and depression.[3]  (*Id.* at 27-28, 32).

Ultimately, on January 7, 2009, ALJ Andres issued a decision, finding that Plaintiff was not disabled from April 30, 2007 through the date of decision.  (*Id.* at 11-18).  Plaintiff sought Appeals Council review.  (*Id.* at 4).  The Appeals Council denied Plaintiff's request on October 13, 2010, rendering ALJ Andres's decision the final decision of the Commissioner.  (*Id.* at 1). Thereafter, on November 17, 2010, Plaintiff appealed the Commissioner's decision to this Court. *Muniz v. Comm'r of Soc. Sec.*, No. 10-6001, 2011 WL 5008082 (D.N.J. Oct. 20, 2011) (Linares, J.).  In an Opinion and Order entered on October 20, 2011, this Court remanded ALJ Andres's decision to the Administration for further analysis.  *Id.*  In response, on December 21, 2011, the Appeals Council issued a Remand Order, thereby vacating the Commissioner's final decision

---

[2] Plaintiff was born on June 26, 1978.  (R. at 322).
[3] The Court describes Plaintiff's impairments in detail below.

and remanding this case to an ALJ for further proceedings consistent with this Court's Opinion and Order.  (R. at 632).

That second hearing took place on April 19, 2012, before ALJ Richard L. De Steno.  (*Id.* at 316-30).  Plaintiff testified that he then weighed four hundred pounds, still lived alone, and typically spent his time lying in bed, watching television.  (*Id.* at 327-28).  He further testified that his mother cooked for him, cleaned for him, and helped him bathe.  (*Id.*).  Once again, Plaintiff testified that he was unable to work because of his back problems, left knee problem, and depression.  (*Id.* at 325, 328).

On May 1, 2012, ALJ De Steno issued a partially favorable decision, finding that Plaintiff was disabled as of January 1, 2011, but not before then.  (*Id.* at 293-306).  Plaintiff again sought Appeals Council review.  (*Id.* at 286).  The Appeals Council denied Plaintiff's request on December 17, 2012, rendering ALJ De Steno's decision the final decision of the Commissioner.  (*Id.* at 280-82).  On February 20, 2013, Plaintiff once again appealed the Commissioner's decision to this Court.  (Compl., ECF No. 1).  This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g), and now recounts Plaintiff's medical history.

B.    Plaintiff's Medical History

Plaintiff contends that he was disabled within the meaning of the Social Security Act prior to January 1, 2011 due to his:  (1) spinal disc disease; (2) osteoarthritic left knee; (3) obesity; (4) diabetes; and (5) mental impairments.  A discussion of the evidence pertaining to these impairments follows.

1.    Plaintiff's Spinal Disc Disease

Plaintiff has spinal disc disease.  In July 2007, Raritan Bay Medical Imaging conducted an MRI on Plaintiff's lumbar spine that, according to Dr. Scott D. Boruchov, revealed:  no

3

visualized cord compression; a posterior left paracentral disc herniation superimposed on mild diffuse disc bulging at the L1-2 disc, accompanied by mild central canal stenosis and bilateral facet joint hypertrophy; moderate diffuse disc bulging at the L2-3 disc, accompanied by mild bilateral subarticular zone stenosis and bilateral facet joint and ligamentous hypertrophy; mild diffuse disc bulging at the L4-5 disc, accompanied by bilateral joint and ligamentous hypertrophy; and broad based herniation that extends into the lateral recesses at the L5-S1 disc, accompanied by bilateral facet joint hypertrophy and bilateral neural foraminal and mild subarticular zone stenosis.  (R. at 177).

Subsequently, in February 2008, State Consultative Examiner Dr. Marc Weber physically examined Plaintiff's spine.  (*Id.* at 183-84).  Plaintiff explained to Dr. Weber that he had been in multiple motor vehicle accidents and that he had experienced back pain for the past decade.  (*Id.* at 183).  Plaintiff further explained that his pain had been treated only with ibuprofen and that he would soon commence physical therapy.  (*Id.*).  Dr. Weber's physical examination revealed limited range of motion in Plaintiff's lumbar spine and a positive straight-leg raising test in the supine position.[4]  (*Id.* at 184).  However, the examination also revealed that Plaintiff could ascend and descend an examination table independently and that he had five-out-of-five muscle strength in his lower extremities.  (*Id.*).

The following month, on March 6, 2008, Plaintiff visited the orthopedic clinic at the Robert Wood Johnson University Hospital, his chief complaint being low back pain.  (*Id.* at 195).  The doctor at the clinic reviewed the July 2007 MRI of Plaintiff's lumbar spine, concluding from it that Plaintiff was positive for diffuse disc degenerative changes, with mild disc bulges at the L2-3 and L5-S1 discs.  (*Id.*).  However, according to the doctor, the MRI did not show canal stenosis or nerve root impingements.  (*Id.*).  The doctor also concluded that

---

[4] Dr. Weber did not record the results of the straight-leg raising test in the sitting position.  (R. at 183, 186).

Plaintiff did not have any indications for surgery, that the use of ibuprofen provided him with some relief, and that he was not disabled.  (*Id.*).

On the same date, March 6, 2008, Dr. Eden Atienza completed a physical residual functional capacity ("RFC") assessment form concerning Plaintiff.  (*Id.* at 187-94).  With regard to exertional limitations, Dr. Atienza concluded that Plaintiff could:  occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull in an unlimited fashion.  (*Id.* at 188).  In support of this conclusion, Dr. Atienza cited to:  the July 2007 MRI; the fact that Plaintiff was not then receiving treatment for his low back impairment; and the "unremarkable" nature of Plaintiff's then-current orthopedic examination except for the limited range of motion of his lumbar spine and his obesity.  (*Id.*).  With regard to postural limitations, Dr. Atienza concluded that Plaintiff could occasionally crawl, crouch, kneel, stoop, and climb ramps or stairs, but that he could never climb ladders, ropes, or scaffolds.  (*Id.* at 189).  Lastly, Dr. Atienza concluded that Plaintiff had no established communicative, environmental, manipulative, or visual limitations.  (*Id.* at 190-91).  Dr. Robert Walsh subsequently affirmed Dr. Atienza's conclusion in June 2008.  (*Id.* at 234).

In October 2008, Dr. Sam Mayerfield took x-rays of Plaintiff's cervical and lumbar spines.  (*Id.* at 272-73).  With regard to the former, Dr. Mayerfield's impression was that the x-ray revealed a "normal examination" of the cervical spine.  (*Id.* at 272).  With regard to the latter, Dr. Mayerfield's impression was that the x-ray revealed mild degenerative spondylosis and multilevel degenerative disc disease in the L1-L2, L2-L3, L3-L4, and L5-S1 discs.  (*Id.* at 273).

From January 2009 to July 2009, Plaintiff received chiropractic treatment from Dr. James C. Wolff at the Perth Amboy Chiropractic Health Center.  (*Id.* at 248-65).  In August 2009, Dr. Wolff prepared an examination report for the Work First New Jersey Program.  (*Id.* at 237-39).  Dr. Wolff concluded therein that Plaintiff had been disabled for more than six months, and diagnosed Plaintiff with lumbar disc herniations, spinal stenosis, and lumbar radiculopathy.  (*Id.* at 237-38).

In September 2009, Dr. Wolff prepared a physical RFC form concerning Plaintiff.  (*Id.* at 268-71).  With regard to exertional limitations, Dr. Wolff opined that Plaintiff could: occasionally lift and/or carry less than ten pounds; frequently lift and/or carry less than ten pounds; stand and/or walk for a total of less than one hour in an eight-hour workday; stand and/or walk for less than ten minutes without interruption; sit for a total of less than two hours in an eight-hour workday; and sit for less than twenty minutes without interruption.  (*Id.* at 268-69).  With regard to postural limitations, Dr. Wolff opined that although Plaintiff could occasionally balance, he could never crawl, kneel, crouch, stoop, or climb.  (*Id.* at 269).  Dr. Wolff also opined that Plaintiff's impairments affected his ability to reach, handle, feel, and push or pull.  (*Id.* at 270).  Dr. Wolff opined that Plaintiff was disabled because of his metabolic obesity, accompanied by lumbar spine disc degeneration.  (*Id.* at 271).  Plaintiff's testimony at the October 2009 hearing before ALJ Andres is consistent with Dr. Wolff's opinion as to Plaintiff's exertional limitations.  (*Id.* at 28-29).  Specifically, Plaintiff testified that he could sit or stand for about fifteen to twenty minutes at a time, and that he was unable to lift ten pounds.  (*Id.*).

In January 2011, Dr. Weber again physically examined Plaintiff's spine.  (*Id.* at 583-84).  Dr. Weber noted that there was tenderness on palpation of the cervical, thoracic, and lumbar interspinous regions at multiple levels.  (*Id.* at 584).  Dr. Weber also noted that Plaintiff had a

positive straight-leg raising test in the supine position, but again did not record the results of the straight-leg raising test in the sitting position. (*Id.* at 584, 587). Dr. Weber's impression was that Plaintiff suffered from chronic neck and back pain with radicular-type symptoms involving the lower back and left lower extremity. (*Id.* at 584).

The next month, in February 2011, Dr. Jyothsna Shastry conducted a physical RFC assessment of Plaintiff. (*Id.* at 339-40). With regard to exertional limitations, Dr. Shastry opined that Plaintiff could: occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk (with normal breaks) for a total of six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and push and/or pull in an unlimited fashion. (*Id.* at 339). With regard to postural limitations, Dr. Shastry opined that Plaintiff: had no restrictions as to balancing; could occasionally kneel, stoop, and climb ramps or stairs; and could never crawl or climb ladders, ropes, or scaffolds. (*Id.*). Lastly, Dr. Shastry opined that Plaintiff had no communicative, environmental, manipulative, or visual limitations. (*Id.* at 340).

The following month, in March 2011, Dr. Wolff prepared a general medical report concerning Plaintiff. (*Id.* at 590-92). Dr. Wolff noted that Plaintiff had multilevel degenerative disc disease at the L1-L2, L2-L3, L3-L4, and L5-S1 discs. (*Id.* at 590). With regard to exertional limitations, Dr. Wolff opined that Plaintiff could: occasionally lift and/or carry five pounds; stand and/or walk for less than two hours per day; sit for less than six hours per day; and push and/or pull in a limited fashion. (*Id.* at 591).

In October 2011, Dr. Steven Meyerson conducted an MRI on Plaintiff's cervical and lumbar spines. (*Id.* at 604-07). The MRI of Plaintiff's cervical spine revealed: disc herniation, which exerted pressure on the thecal sac, at the C6-C7 disc; mild disc bulging, which exerted pressure on the thecal sac, and mild active endplate changes at the C5-C6 disc; and mild reversal

of the normal lordotic curvature of the cervical spine, suggestive of muscle spasm. (*Id.* at 605). The MRI of Plaintiff's lumbar spine revealed: small broad-based disc herniation at the L1-L2 disc; broad-based disc herniation, which exerted pressure on the thecal sac, and degenerative endplate changes at the L2-L3 disc; small right foraminal disc herniation at the L3-L4 disc; and broad-based disc herniation and degenerative endplate changes at the L5-S1 disc. (*Id.* at 607).

In January 2012, Plaintiff's chiropractor, Dr. Ryan Varga, completed a physical RFC form concerning Plaintiff. (*Id.* at 601-03). Dr. Varga opined that Plaintiff could not lift and/or carry more than ten pounds, and that he should avoid heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration. (*Id.* at 602). Dr. Varga also opined that Plaintiff had difficulty reaching, handling, feeling, pushing, and pulling. (*Id.*).

At the April 2012 hearing before ALJ De Steno, Plaintiff testified that he had constant pain in his mid-back and neck, which radiated to his legs and shoulders. (*Id.* at 325-36). This pain, according to Plaintiff, interfered with his ability to sleep and caused him to walk with a limp. (*Id.* at 326). Plaintiff also testified that he had been receiving physical therapy from a chiropractor, which helped ease his pain, but only momentarily. (*Id.* at 328). With regard to his exertional limitations, Plaintiff testified that he was unable to bend and that he could sit for about fifteen minutes at a time, stand for ten minutes at a time, and pick up a gallon of water with both of his hands, but not repeatedly. (*Id.* at 329). According to Plaintiff, he is most comfortable when he is lying down. (*Id.*).

### 2.   Plaintiff's Osteoarthritic Left Knee

Plaintiff suffers from chronic left knee pain, which he claims he has experienced since childhood, and has a history of osteoarthritis involving that knee. (*Id.* at 583-84). In July 2007, after examining Plaintiff's left knee, Dr. Laura Grygotis concluded that the alignment of that

knee appeared normal and that there was no visible fracture. (*Id.* at 518). Subsequently, in January 2008, Dr. Jack Baharlias observed during a consultative examination that Plaintiff's posture and gait were "unremarkable." (*Id.* at 180). The following month, in February 2008, Dr. Weber observed during his consultative physical examination that while Plaintiff ambulated with a "waddling gait," he did so independently without an assistive device. (*Id.* at 183-84). Dr. Weber again physically examined Plaintiff in January 2011. (*Id.* at 583-84). Dr. Weber noted that Plaintiff's gait pattern was then within "normal limits," and that he ambulated independently without an assistive device and is independent in activities of daily living. (*Id.*). Dr. Weber also noted that there was tenderness on palpation of the anterior aspect of Plaintiff's left knee, and that Plaintiff could not squat or stand on his heels or toes. (*Id.* at 584).

### 3.   Plaintiff's Obesity

Plaintiff is obese. (*Id.* at 28). At the October 2009 hearing before ALJ Andres, Plaintiff testified that he is 6' 1" tall and that he then weighed about 380 pounds. (*Id.*). He also testified that his weight fluctuates. (*Id.*). At the April 2012 hearing before ALJ De Steno, Plaintiff testified that he then weighed 400 pounds, again noting that his weight fluctuates. (*Id.* at 327). Plaintiff further testified that his pain prevents him from exercising. (*Id.* at 328).

### 4.   Plaintiff's Diabetes

As of October 2009, according to Plaintiff, he is post-diabetic and does not require diabetes medication. (*Id.* at 33). Although Plaintiff is post-diabetic, according to Dr. Weber's February 2008 and January 2011 physical consultative examinations, Plaintiff could fully extend his hands, make fists, oppose his fingers, separate papers, and lift a pin off of a table. (*Id.* at 184, 584). But Dr. Weber's February 2008 examination revealed that Plaintiff had diminished sensation to light touch in both of his feet. (*Id.* at 184).

5.      Plaintiff's Mental Impairments

On May 11, 2007, Plaintiff checked into the emergency department at Raritan Bay Medical Center, complaining of depression, and told the staff that he had been cutting his arm because he had recently lost his girlfriend, job, and house.  (*Id.* at 164, 169).  Plaintiff had never been hospitalized due to his depression before then.  (*Id.* at 549).  Shortly thereafter, on May 16, 2007, Plaintiff began meeting with Channi Kharbanda, a licensed social worker at the Raritan Bay Medical Center.  (*Id.* at 581).  Plaintiff met fairly regularly with Kharbanda until March 2011 and, throughout that time, Kharbanda took notes about their meetings.  (*Id.* at 553-82). Kharbanda's notes generally focus on Plaintiff's various relationships with women and his family life.  (*See id.*).  Indeed, Kharbanda's notes from 2007 state that Plaintiff:  was still pining for his girlfriend in June 2007; described his relationship to her in July 2007; and had a new girlfriend in October 2007.  (*Id.* at 579, 581-82).  To treat his mental impairments, Plaintiff has taken psychotropic medication, including Wellbutrin, Invega, and Seroquel.  (*Id* at 532).

In January 2008, State Consultative Examiner Dr. Jack Baharlias performed a mental evaluation of Plaintiff.  (*Id.* at 179-82).  Dr. Baharlias noted that Plaintiff denied suicidal ideation at the time of the evaluation.  (*Id.* at 180).  Dr. Baharlias further noted that Plaintiff stated that he hears his dead brother's voice talking to him and that he feels his brother's presence rubbing on his back.  (*Id.* at 181).  Ultimately, Dr. Baharlias diagnosed Plaintiff with major depressive disorder with psychotic features of auditory and tactile hallucinations.  (*Id.* at 181).  The following month, during a visit with Kharbanda in February 2008, Plaintiff talked about a friend he was dating.  (*Id.* at 580).

On March 24, 2008, Dr. Amy Brams completed a psychiatric review technique form and mental RFC assessment form concerning Plaintiff.  (*Id.* at 198-215).  Dr. Brams opined that

Plaintiff suffers from the following mental impairments:  (1) an affective disorder (either depressive disorder or major depressive disorder); (2) an anxiety-related disorder (post traumatic stress disorder, delayed); and (3) impulse control disorder.  (*Id.* at 198, 201, 203, 205).  These impairments, according to Dr. Brams, resulted in no episodes of extended duration and the following functional limitations:  moderate restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (*Id.* at 208).  Dr. Brams also completed a mental RFC assessment, wherein she opined that Plaintiff "is able to follow simple instructions, attend and concentrate, keep adequate pace and persist, [and] relate and adapt to routine tasks in a work situation." (*Id.* at 214).  She also opined that there was little evidence to support the level of depression that Dr. Baharlias described in his January 2008 consultative mental evaluation.  (*Id.*).

Shortly thereafter, during a visit with Kharbanda on March 28, 2008, Plaintiff stated that he had met a new woman that lived upstairs and that he felt better when in a relationship.  (*Id.* at 577).  About one week later, on April 7, 2008, Plaintiff told Kharbanda that he could not decide which of two women to date.  (*Id.*).  One month later, on May 6, 2008, Plaintiff again discussed his relationship issues with Kharbanda and told her that he got a car.  (*Id.* at 578).

The following week, on May 15, 2008, Plaintiff's mother prepared a function report, which described how Plaintiff's impairments limited his activities.  (*Id.* at 132-39).  She noted, among other things, that Plaintiff's depression prevented him from doing anything, that he had no social activities, and that he spent no time with others.  (*Id.* at 135-37).  She also noted that Plaintiff has had difficulty following spoken instructions.  (*Id.* at 137).

In a letter sent to Disability Determination Services, Kharbanda described Plaintiff's visit with her on May 27, 2008.  (*Id.* at 219-20).  She noted that Plaintiff denied experiencing

hallucinations, or suicidal or homicidal ideations.  (*Id.* at 219).  She also noted that Plaintiff spoke spontaneously and conversationally, and that his responses were relevant and coherent. (*Id.*).  Additionally, Kharbanda noted that Plaintiff exhibited no evidence of psychosis and that his concentration was unimpaired with no memory deficits.  (*Id.*).  In contrast to the report prepared by Plaintiff's mother two weeks earlier, Kharbanda noted that she had seen Plaintiff socializing more at the time.  (*Id.*).

In July 2008, Kharbanda noted that Plaintiff was not taking his psychotropic medication and that he did not want to attend an anger management group.  (*Id.* at 574).  In September 2008, Kharbanda noted that when Plaintiff thinks about death, he refers to such thinking as hallucinations, and that it was unclear whether Plaintiff actually hallucinates or simply fears things.  (*Id.* at 573).  Subsequently, during a visit with Kharbanda in December 2008, Plaintiff described his mother as "controlling," noting that she did not want him to go out.  (*Id.* at 571). The following month, in January 2009, Plaintiff informed Kharbanda that he was dating two new women.  (*Id.* at 570).  Kharbanda commented at the time that Plaintiff was using these women, and that "[h]e loves drama, thrives on it, [and] creates it."  (*Id.*).  She also concluded that Plaintiff was not depressed anymore.  (*Id.*).

In May 2009, Plaintiff's psychiatrist diagnosed Plaintiff with depressive disorder and psychosis, and assigned him a Global Assessment of Functioning ("GAF") rating of sixty-five through seventy.[5]  (*Id.* at 540).  Two months later, in July 2009, Plaintiff discussed his then-latest

---

[5] The GAF Scale ranges from zero to one-hundred.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000) (hereinafter DSM-IV-TR).  An individual's "GAF rating is within a particular decile if *either* the symptom severity or the level of functioning falls within the range."  *Id.* at 32. "[I]n situations where the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two."  *Id.* at 33.  "In most instances, ratings on the GAF Scale should be for the current period (*i.e.*, the level of functioning at the time of the evaluation) because ratings of current functioning will generally reflect the need for treatment or care."  *Id.*  A GAF rating of sixty-one to seventy indicates that an individual has "[s]ome mild symptoms," e.g., a "depressed mood and mild insomnia," or "some difficulty in social,

relationship with Kharbanda, noting that he was talking to a new woman over the phone even though he was still in a relationship. (*Id.* at 564). In her treatment note, Kharbanda expressed frustration with Plaintiff, remarking that Plaintiff knows what to say to women, and "knows what to say to me [and] other [doctors] to get sympathy too." (*Id.*).

In August 2009, Plaintiff's psychiatrist noted that Plaintiff had a euthymic mood and full affect. (*Id.* at 539). The psychiatrist further noted that Plaintiff had no auditory hallucinations, delusional thoughts, or suicidal or homicidal ideations. (*Id.*). The psychiatrist assigned Plaintiff a GAF rating of sixty-five. (*Id.*). Two months later, in October 2009, the psychiatrist observed that Plaintiff had an angry mood, but still assigned him a GAF rating of seventy. (*Id.* at 538). At the time, Plaintiff denied having any hallucinations or suicidal or homicidal ideations. (*Id.*).

In January 2010, Plaintiff's psychiatrist noted that Plaintiff was losing weight and was happy, but that he still had relationship problems. (*Id.* at 537). The psychiatrist also noted that Plaintiff had a euthymic mood, goal directed speech, congruent mood and affect, and good insight, judgment, impulse control, and orientation. (*Id.*). Plaintiff denied having auditory hallucinations or suicidal or homicidal ideations that month. (*Id.*). The psychiatrist assigned Plaintiff a GAF rating of seventy-five.[6] (*Id.*).

Kharbanda's 2010 treatment notes generally describe Plaintiff's relationship and family issues. (*See id.* at 555-60). In April 2010, Plaintiff told Kharbanda that he was worried about losing his then-current girlfriend. (*Id.* at 559). In June 2010, Kharbanda noted that Plaintiff has a tendency to sabotage his relationships, and that he would rather keep going from to relationship

occupational, or school functioning . . ., but generally function[s] pretty well, [and] has some meaningful interpersonal relationships." *Id.* at 34.

[6] From May 2009 to January 2011, Plaintiff's psychiatrist assigned him GAF ratings ranging from sixty-five to seventy-five. (*Id.* at 532, 534-41). A GAF rating of seventy-one through eighty indicates that if symptoms are present in an individual, "they are transient and expectable reactions to psychological stressors," and that an individual has "no more than slight impairment in social, occupational, or school functioning . . . ." DSM-IV-TR 34.

13

to relationship without worrying about the consequences.  (*Id.* at 558).  In December 2010, Kharbanda noted that Plaintiff's family was then pushing responsibility over babysitting his nephew onto him.  (*Id.* at 555).

The following month, in January 2011, Plaintiff's psychiatrist noted that Plaintiff had a good time over the holidays, and that he partied and ate a lot.  (*Id.* at 532).  At the time, according to the psychiatrist, Plaintiff had a euthymic mood, constricted affect, and good orientation, insight, judgment, and impulse control.  (*Id.*).  Additionally, Plaintiff denied having hallucinations or suicidal or homicidal ideations.  (*Id.*).

At the April 2012 hearing before ALJ De Steno, Plaintiff testified that he fights depression and anxiety every day, and that these conditions have not changed overtime.  (*Id.* at 327-28).  Plaintiff also testified that his anxiety fatigues him.  (*Id.* at 327).

## II.    LEGAL STANDARD

### A.    The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the Administration is authorized to pay a period of disability, disability insurance benefits, and supplemental security income to "disabled" persons. 42 U.S.C. §§ 423(a), 1382(a).  A person is "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1).  At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(f), 416.920(a)(4)(i).  If so, the claimant is not disabled and, thus, the process ends.  20 C.F.R. §§ 404.1520(a)(4)(f), 416.920(a)(4)(i).  If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Absent such impairment, the claimant is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Conversely, if the claimant has such impairment, the ALJ proceeds to step three.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If so, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's [RFC]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

The claimant bears the burden of proof for steps one through four. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007) (citing *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004). "At step five, the burden of proof shifts to the . . . Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]." *Id.* (citing *Ramirez*, 372 F.3d at 551).

      B.     The Standard of Review: "Substantial Evidence"[7]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

**III.    DISCUSSION**

At step one, ALJ De Steno found that Plaintiff had not engaged in substantial gainful activity since April 30, 2007, the alleged onset date. (R. at 295). At step two, ALJ De Steno found that Plaintiff has had the following severe impairments: (1) spinal disc disease; (2)

---

[7] Because the regulations governing supplemental security income—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

osteoarthritis of the left knee; (3) diabetes; (4) obesity; (5) depression; (6) an anxiety disorder

with panic attacks; and (7) an impulse control disorder.  (*Id.* at 296).  At step three, ALJ De

Steno found that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled one of the listed impairments.  (*Id.*).  At step four, ALJ De Steno determined

that prior to January 1, 2011, Plaintiff had the RFC to perform the full range of "light work"

without significant nonexertional limitations, noting that Plaintiff "was able to follow simple

instructions, maintain attention, concentration, and adequate pace and persistence, and to relate

and adapt to routine tasks in a work situation."  (*Id.* at 298).  Beginning on January 1, 2011, ALJ

De Steno determined that Plaintiff has had the RFC:

> to lift and carry objects weighing up to five pounds; sit for up to
> six hours in half-hour intervals; and stand and walk up to two
> hours in half-hour intervals; and stand and walk up to two hours in
> half-hour intervals in an eight-hour day.  [Plaintiff] can never bend,
> squat, or stoop.  He can do no work requiring sustained periods of
> concentration or strict adherence to a work schedule.

(*Id.* at 302).  As Plaintiff had no past relevant work, ALJ De Steno continued on to step five.  (*Id.*

at 304).  At step five, ALJ De Steno found that given Plaintiff's age, education, work experience,

and RFC, there were jobs existing in significant numbers in the national economy that Plaintiff

could have performed prior to January 1, 2011.  (*Id.* at 305).  Thus, ALJ De Steno concluded that

Plaintiff was not disabled prior to that date.  (*Id.*).  Beginning on January 1, 2011, however, ALJ

De Steno concluded that given Plaintiff's age, education, work experience, and RFC, there were

no jobs existing in significant numbers in the national economy that Plaintiff could perform.  (*Id.*

at 305).  As such, ALJ De Steno concluded that Plaintiff has been disabled since that date.  (*Id.*).

Plaintiff contends that ALJ De Steno erred at steps three, four, and five.  (Pl.'s Br. 14-35, ECF

No. 10).

A. <u>Whether ALJ De Steno's Step Three Findings are Based on Substantial Evidence</u>

At step three, an ALJ must "fully develop the record and explain his findings . . . , including an analysis of whether and why [each of the claimant's] impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Burnett*, 220 F.3d at 120.  In conducting such an analysis, there is no formal requirement that an ALJ "use particular language or adhere to a particular format . . . ."  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  Rather, an ALJ's decision, "read as a whole," must permit meaningful judicial review.  *Id.*; *see also Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146 (3d Cir. 2007).

Here, ALJ De Steno began his step three analysis with his determination that "[s]ince the alleged onset date of disability, April 30, 2007, [Plaintiff] has not had an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments . . . ." (R. at 296).  ALJ De Steno then proceeded to find that:  (1) Plaintiff's spinal disc disease did not meet the listing for disorders of the spine (Listing 1.04); (2) Plaintiff's osteoarthritic left knee did not meet the listings that pertain to either major dysfunction of a joint (Listing 1.02) or surgery involving a major weight-bearing joint (Listing 1.03); (3) Plaintiff's diabetes did not meet the listing for endocrine disorders (Listing 9.00) or any other listing; (4) Plaintiff's obesity, "even when . . . considered in combination with [his] other impairments, [did] not meet or equal the criteria of any of the listed impairments;" and (5) Plaintiff's mental impairments did meet the listings that pertain to affective disorders (Listing 12.04), anxiety related disorders (Listing 12.06), or personality disorders (Listing 12.08).  (*Id.* at 296-98). Plaintiff argues that each of these findings is flawed.  (Pl.'s Br. 14-25).  Plaintiff also generally

argues that ALJ De Steno erred at step three because he did not properly consider whether his impairments, in combination, met or medically equaled a listed impairment.  (*Id.*).

       1.      <u>Whether ALJ De Steno's Finding That Plaintiff's Spinal Disc Disease Did Not Meet the Listing for Disorders of the Spine is Based on Substantial Evidence</u>

Plaintiff argues that ALJ De Steno's finding that his spinal disc disease did not meet the listing for disorders of the spine (Listing 1.04) is not based on substantial evidence.  (*Id.* at 14-18).  In support of this argument, Plaintiff maintains that "[a] careful reading of the actual elements required to meet [either Paragraph A or B of Listing 1.04] reveals an inescapable reality that Plaintiff is equivalent to both listings."  (*Id.* at 15).  The Court disagrees.

To meet Paragraph A of Listing 1.04, a claimant must show that he has a disorder of the spine with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss *and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)* . . . ."  20 C.F.R. Part 404, Subpart P, App'x 1, § 1.04 (emphasis added).  Here, ALJ De Steno concluded that Plaintiff's spinal disc disease in his lumbar spine did not satisfy these criteria because, among other reasons, Dr. Weber did not indicate in either his February 2008 or January 2011 consultative physical examinations that Plaintiff had a positive straight-leg raising test in the sitting position. (R. at 296).  At bottom, Plaintiff bears the burden of proof at step three, *Meyler v. Comm'r of Soc. Sec.*, 238 F. App'x 884, 889 (3d Cir. 2007), and he has failed to point to any evidence in the record establishing that he had a positive straight-leg raising test in the sitting position. Consequently, Plaintiff has failed to establish that his spinal disc disease met Paragraph A of Listing 1.04.

To meet Paragraph B of Listing 1.04, a claimant must show that he has a disorder of the spine with "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, *and resulting in inability to ambulate effectively, as defined in 1.00B2b*." 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.04 (emphasis added). Plaintiff contends that he was unable to ambulate effectively since, as Dr. Weber observed in his February 2008 consultative physical examination, he then ambulated with a "waddling gait." (Pl.'s Br. 16-17). However, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.00B2b. Thus, even a claimant that waddles may be able to ambulate effectively in light of this definition.[8] Here, ALJ De Steno concluded that "[t]he evidence demonstrated that [Plaintiff] can ambulate effectively" because Plaintiff ambulated independently without an assistive device and was independent in his activities of daily living. (R. at 297). As such, ALJ De Steno provided evidence that was adequate to support his conclusion, thereby meeting the "substantial evidence" standard. *See, e.g.*, *Harris v. Comm'r of Soc. Sec.*, No. 09-3219, 2010 WL 2874352, *4 (D.N.J. July 19, 2010) (concluding that substantial evidence supported ALJ's finding that plaintiff could ambulate effectively since consultative examiner found that Plaintiff ambulated independently without an assistive device and was independent in activities of daily living). It also bears mentioning that although ALJ De Steno did not mention that Plaintiff ambulated with a waddling gait in his step three analysis, he later mentioned that fact in his step four analysis. (R. at 299).

---

[8] Notably, Plaintiff acknowledges in his brief that "[i]t is doubtful that the waddling satisfies the requirements of Paragraph 1.00B2b since that paragraph contemplates the use of crutches or two canes." (Pl.'s Br. 17).

2.      Whether ALJ De Steno's Findings That Plaintiff's Osteoarthritic Left Knee Did Not Meet the Listings Pertaining to Either Major Dysfunction of a Joint or Surgery Involving a Major Weight-Bearing Joint are Based on Substantial Evidence

ALJ De Steno's findings that Plaintiff's osteoarthritic left knee did not meet the criteria of either the listing for major dysfunction of a joint (Listing 1.02) or the listing for surgery involving a major weight-bearing joint (Listing 1.03) are based on substantial evidence. As is relevant here, to meet Listing 1.02, a claimant must demonstrate that he is unable to ambulate effectively. 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.02. As discussed above, ALJ De Steno adequately supported his conclusion that Plaintiff could ambulate effectively. Additionally, since Plaintiff did not provide evidence establishing that surgery has been performed on Plaintiff's osteoarthritic left knee, Listing 1.03 is not met here. 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.02. As such, the Court affirms ALJ De Steno's findings pertaining to Listings 1.02 and 1.03.

3.      Whether ALJ De Steno's Finding That Plaintiff's Diabetes Did Not Meet Any Listing is Based on Substantial Evidence

Plaintiff argues that in finding that his diabetes did not meet the criteria of any listing, including the listing for endocrine disorders (Listing 9.00), ALJ De Steno overlooked evidence suggesting that Plaintiff suffered from neuropathy. (Pl.'s Br. 21-22). Specifically, Plaintiff points out that ALJ De Steno failed to mention in his step three analysis that Dr. Weber noted in his February 2008 physical consultative examination that Plaintiff had sensory loss in both of his feet. (Pl.'s Br. 22 (citing R. at 186)). While ALJ De Steno did not mention this evidence in his step three analysis, it cannot be said that ALJ De Steno completely overlooked it. In his step four analysis, ALJ De Steno explicitly stated that Dr. Weber's February 2008 examination revealed that Plaintiff had "decreased sensation to light touch in both feet." (R. at 299).

Therefore, ALJ De Steno's decision, "read as a whole," illustrates that he considered the appropriate factors, thereby satisfying the Third Circuit's mandate in *Burnett* that an ALJ's decision must sufficiently develop the record to permit meaningful judicial review. *Jones*, 364 F.3d at 505.  In any event, Plaintiff fails to explain how the evidence pertaining to the diminished sensation in his feet establishes that he met a listing.  This failure is significant since Plaintiff "bears the ultimate burden of establishing steps one through four." *Poulos*, 474 F.3d at 92 (citation omitted).

        4.     <u>Whether ALJ De Steno's Finding That Plaintiff's Obesity Did Not Meet or Equal the Criteria of Any Listing is Based on Substantial Evidence</u>

Plaintiff argues that ALJ De Steno did not properly consider Plaintiff's obesity in combination with his other impairments.  (Pl.'s Br. 20-21).  The Court disagrees.  In *Diaz v. Commissioner of Social Security*, the Third Circuit held that "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with [his] impairments, on [his] workplace function at step three . . . ."  577 F.3d 500, 504 (3d Cir. 2009).

Here, ALJ De Steno provided such meaningful consideration.  ALJ De Steno explicitly acknowledged that Plaintiff was obese during the relevant time period, and said that his obesity "arguably increase[d] the severity of his back and knee conditions."  (R. at 297).  Nonetheless, ALJ De Steno noted that, according to Kharbanda's treatment notes, Plaintiff drove a car, socialized, and performed activities of daily living.  (*Id.*).  Plaintiff assails these facts as irrelevant, but the Court disagrees since they are pertinent to Plaintiff's physical and mental abilities as an obese individual.  *See* SSR 02-1p (noting that obesity may "cause or contribute to mental impairments such as a depression").  Moreover, ALJ De Steno cited a March 2009 progress note from the Robert Wood Johnson University Hospital Orthopedic Clinic.  (R. at 297).  The doctor that prepared this note reported that Plaintiff was morbidly obese, but opined

that Plaintiff had "no disability." (*Id.* at 195). Since ALJ De Steno discussed Plaintiff's obesity and provided some evidence in support of his finding that "even when obesity is considered in combination with [Plaintiff's] other impairments, he does not meet or equal the criteria of any of the listed impairments," (*Id.* at 297), the Court affirms ALJ De Steno's finding. *See, e.g.*, *Carter v. Astrue*, No. 12-2788, 2013 WL 1845670, *10 (D.N.J. Apr. 30, 2013) (affirming ALJ's finding that plaintiff's obesity, in combination with his other impairments, did not meet a listing because "the ALJ noted [p]laintiff's obesity and his weight several times throughout the decision").

> 5.   Whether ALJ De Steno's Findings That Plaintiff's Mental Impairments Did Not Meet or Equal the Listings Pertaining to Depression, Anxiety, or Impulse Disorder are Based on Substantial Evidence

Plaintiff argues that ALJ De Steno failed to properly compare Plaintiff mental impairments—depression, an anxiety disorder with panic attacks, and impulse control disorder—with the listings for affective disorders (Listing 12.04), anxiety related disorders (Listing 12.06), and personality disorders (Listing 12.08), respectively. (Pl.'s Br. 23-24). The crux of Plaintiff's argument is that ALJ De Steno's finding that Plaintiff's mental impairments did not meet the Paragraph B criteria of those listings is "utterly unadorned," and is thus inadequate.[9] (*Id.* at 24). Contrary to Plaintiff's argument, ALJ De Steno provided evidence in support of his finding. (R. at 297-98). Specifically, ALJ De Steno noted that the focus of Plaintiff's therapy sessions, based on Kharbanda's notes, "was on romantic relationship issues, rather than depression or anxiety issues." (*Id.*). Relatedly, ALJ De Steno further noted that Plaintiff often dated multiple women

---

[9] To satisfy the Paragraph B criteria of Listings 12.04, 12.06, and 12.08, a claimant must demonstrate that his mental impairment(s) result in at least two of the following:

> 1.   Marked restriction of activities of daily living; or
> 2.   Marked difficulties in maintaining social functioning; or
> 3.   Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.   Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpart P, App'x 1, §§ 12.04, 12.06, 12.08. A limitation is "marked" when it is "more than moderate but less than extreme." 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00C.

at once, socialized with them, and that he obtained a car and drove. (*Id.* at 297). Thus, the Court concludes—as it did for essentially the same reasons in its October 20, 2011 Opinion in this case—that ALJ De Steno's finding as to the Paragraph B criteria is based on substantial evidence. *See Muniz*, 2011 WL 5008082 at *9.

6.   Whether ALJ De Steno Properly Considered Plaintiff's Impairments in Combination With Each Other at Step Three

Plaintiff generally argues that ALJ De Steno failed to properly consider Plaintiff's impairments in combination with each other at step three. (Pl.'s Br. 14-25). Plaintiff's argument is unpersuasive. With regard to an ALJ's duty to consider a claimant's impairments in combination with one another, the Third Circuit has suggested that an ALJ fulfills that duty if he indicates that he has done so and there is "no reason not to believe him." *Morrison ex. rel. Morrison v. Comm'r of Soc. Sec.*, 268 F. App'x 186, 189 (3d Cir. 2008). Moreover, a number of district courts in this Circuit have concluded that an ALJ fulfills his obligation to consider a claimant's impairments in combination with one another when he states that he has done so and offers a thorough review of the evidence in the record. *See, e.g.*, *Mason v. Astrue*, No. 09-5553, 2010 WL 3024849, *6 (D.N.J. Aug. 2, 2010).

Here, ALJ De Steno explicitly indicated at the beginning of his step three discussion that Plaintiff "has not had an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments . . . ." (R. at 296). In light of ALJ De Steno's thorough discussion of the record throughout his opinion and detailed explanation as to why each of Plaintiff s impairments did not meet a listing, the Court has no reason to disbelieve ALJ De Steno's indication that he considered the combined effect of Plaintiff's impairments. *See Jones*, 364 F.3d at 505 (finding ALJ's step three determination adequate because ALJ's decision, "read as a whole," illustrated that ALJ considered the appropriate factors); *see also Gainey v. Astrue*,

24

No. 10–1912, 2011 WL 1560865, *12 (D.N.J. Apr. 25, 2011) (citation omitted) (holding that "ALJ's detailed analysis of the individual impairments and conclusion that Plaintiff did not have 'an impairment or combination of impairments' that met or equaled a listing is sufficient.").

       B.      Whether ALJ De Steno's RFC Determination is Based on Substantial Evidence

At step four, ALJ De Steno determined that prior to January 1, 2011, Plaintiff had the RFC to perform the full range of "light work"[10] without significant nonexertional limitations, as per SSR 85-15, noting that Plaintiff "was able to follow simple instructions, maintain attention, concentration, and adequate pace and persistence, and to relate and adapt to routine tasks in a work situation." (R. at 298). Plaintiff generally argues that ALJ De Steno "did not offer a single explanation for the RFC determination for the full range of light work." (Pl.'s Br. 34). Plaintiff's argument is unavailing.

In making his RFC determination, an ALJ must consider all pertinent and probative evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203–04 (3d Cir. 2008) (citing *Burnett*, 220 F.3d at 121 and *Cotter v. Harris*, 642 F.2d 700, 705–07 (3d Cir. 1981)). Here, ALJ De Steno provided a thorough four-page discussion of the record in support of his RFC finding, and, in doing so, weighed the available evidence. (R. at 298-302). With regard to Plaintiff's

---

[10] The social security regulations provide that:

    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

nonexertional impairments,[11] ALJ De Steno explained why he found both Dr. Baharlias's

consultative mental evaluation and Plaintiff's statements concerning his mental impairments

incredible.  (*See id.*).  In particular, ALJ De Steno noted that Kharbanda's treatment notes

demonstrate that Plaintiff was a sociable person prior to January 1, 2011, contrary to Plaintiff's

October 2009 testimony that he did not do things outside his home.  (*Id.* at 301).  ALJ De Steno

also highlighted that Kharbanda opined that Plaintiff was no longer depressed as of January 2009

and the relatively high GAF ratings that Plaintiff's psychiatrist assigned to him throughout 2009

and 2010.  (*Id.* at 301-02).

    With regard to Plaintiff's exertional impairments, ALJ De Steno acknowledged that Dr.

Wolff opined in his September 2009 physical RFC form that Plaintiff "was limited to

significantly less than sedentary work, finding that [Plaintiff] could lift and carry less than 10

pounds; stand/walk one hour in an eight-hour day; and sit less than two hours in an eight-hour

day."  (*Id.* at 299).  However, ALJ De Steno ultimately concluded Dr. Wolff's opinions

warranted little weight since they "were contradicted by the MRI evidence and the orthopedic

clinical records, which noted that [Plaintiff] was not a surgical candidate and was not disabled,

and [Plaintiff's] social lifestyle, which ha[d] not slowed down in spite of his impairments."  (*Id.*).

ALJ De Steno also discussed other evidence that cut against Dr. Wolff's opinion.  For example,

ALJ De Steno discussed Dr. Atienza physical RFC form, which opined that Plaintiff could:

occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or

walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with

normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull in an

unlimited fashion.  (*Id.* at 299).  Because ALJ De Steno has provided more than a mere scintilla

---

[11] "A nonexertional impairment is one which is medically determinable and causes a nonexertional limitation of function or an environmental restriction."  SSR 85-15.  "Mental impairments are generally considered to be nonexertional, but depressions and conversion disorders may limit exertion."  SSR 85-15.

of evidence in support of his RFC determination and it is not the role of this Court to reweigh the evidence and reach its own conclusions, *See Williams*, 970 F.2d at 1182 (noting that a district court is not empowered to "weigh the evidence or substitute its conclusions for those of the fact-finder"), the Court affirms ALJ De Steno's RFC determination.

      C.      <u>Whether ALJ De Steno Erred at Step Five by Relying on the Medical-Vocational Guidelines</u>

      At step five, ALJ De Steno concluded that prior to January 1, 2011, a finding of "not disabled" was directed by Medical-Vocational Guideline 202.20 based on Plaintiff's age, education, work experience, and RFC for the full range of light work.  (R. at 305).  Plaintiff argues that ALJ De Steno's application of the Medical-Vocational Guidelines did not accurately reflect all of Plaintiff's alleged limitations, including those stemming from his mental impairments.  (Pl.'s Br. 12, 34).  This argument is unpersuasive.  As discussed above, ALJ De Steno's RFC determination was based on substantial evidence, and therefore additional limitations were not appropriate.  Consequently, it was proper for ALJ De Steno to rely on Medical-Vocational Guideline 202.20, which directs a decision of "not disabled" for younger individuals who are high school graduates with no work experience and an RFC for light work. 20 C.F.R. Part 404, Subpart P, App'x 2; *see, e.g.*, *Nerahoo v. Colvin*, No. 12-6553, 2013 WL 6190197, *6-7 (D.N.J. Nov. 26, 2013) (affirming ALJ's step five reliance on the Medical-Vocational Guidelines where ALJ's RFC finding was based on substantial evidence).

**IV.     CONCLUSION**

       The Court has reviewed the entire record and, for the reasons discussed above, concludes that ALJ De Steno's determination that Plaintiff was not disabled was supported by substantial evidence.  Accordingly, ALJ De Steno's decision is affirmed.  An appropriate Order accompanies this Opinion.

DATED: June 27, 2014              <u>s/ Jose L. Linares</u>
                                        JOSE L. LINARES
                                        U.S. DISTRICT JUDGE